Salinger, Kenneth W., J.
The Boston Police obtained information from Michael Jordan’s cell phone service provider regarding the use of his phone over a six-week period. The police sought this information pursuant to a search warrant, as part of an ongoing murder investigation. Jordan moves to suppress all of this information.
The Court must allow the motion to the extent it seeks to suppress cell site location information (“CSLI”), incoming or outgoing text messages, and contact information. The Court concludes that Jordan has a reasonable expectation of privacy not only in historic “telephone call” CSLI, but also in his so-called registration CSLI, text messages, and contact list. Jordan has a constitutionally protected interest in that information even though it was stored in the Cloud by the service provider, rather than saved only on Jordan’s phone. The Court also concludes that the search warrant affidavit did not establish probable cause to believe that any of this information would provide evidence of who committed this murder, or aid in apprehending someone whom the police had probable cause to believe had committed this murder. The statements by a confidential informant that someone told the C.I. that “Michael” had killed the victim over drug dealing could not be considered because the affidavit did not establish any basis for the C.I.’s knowledge, demonstrate that the C.I. was reliable, or show that the police had corroborated any of this information. Without the C.I.’s statements, there was nothing to link Jordan to the eyewitness descriptions of the killer and his vehicle.
In contrast, Jordan had no reasonable expectation of privacy in information identifying the person who subscribed to service for this cell phone number or in telephone call details such as date, time, and numbers involved. The Court will therefore deny the motion to the extent that it seeks to suppress this additional information.
1. Background—Search Warrant and Affidavit
On December 30, 2013, a Boston Police detective applied for and obtained a search warrant authorizing the police to obtain location and other information for a particular cell phone number over a six-week period. The warrant authorized the collection of the following information: “cell site tower locations, call details, incoming/outgoing text messages, subscriber information, cell sites and GPS records regarding [Jordan’s] cellular phone number . . . from August 1, 2013 through September 12, 2013.” A police officer or detective filed a return on January 15, 2014, stating that the police had obtained all of this information from MetroPCS in electronic form.
The affidavit submitted in support of this search warrant application was signed under the pains and penalties of perjury by Boston Police Detective Melvin Ruiz, who was assigned to the Boston Police Homicide Unit. Det. Ruiz provided the following information in his affidavit.
1.1. Eye Witness Reports of Shooting
The Boston Police were investigating the murder of Mr. Ahmir Lee, who was shot in the chest and killed just after 11:00 p.m. on August 22, 2013. This shooting took place on Boylston Street, between Clarendon and Dartmouth Streets and next to Copley Square in the Back Bay neighborhood of Boston.
Five witnesses provided the police with somewhat contradictory information about the appearance of the apparent assailant. Four of the five described this man as stocky or heavy, and they all agreed that he appeared to be black or Hispanic. But their actual descriptions varied widely.
The first witness heard three loud gunshots and then saw a man walk really fast from Boylston Street to a car parked on Clarendon Street, and then drive off quickly. She described the suspect as a light skinned black man, who was stocky and around five feet, seven inches to five feet, eight inches in height, had a shaved head, and was wearing a baggy baby blue shirt with designs and oversized jean shorts.
The second witness heard three or four gunshots and then saw a man place something in his waistband and walk away toward Trinity Church. He described the suspect as a white Hispanic man in his mid-thirties, who was heavy and around five feet, one-inch to five feet, two inches tall, and was wearing a blue baggy shirt and jean shorts down to his knees.
The third witness heard several pops and then saw a man run from the scene. He described the suspect as a black man, who was stocky and only about four feet, nine inches tall, and was wearing a bright blue, baseball style, short-sleeved shirt.
The fourth witness heard a shout, looked up, saw and heard a man fire three or four gunshots and *182 then saw him run toward Clarendon Street. He described the suspect as a black Hispanic man, with the “skin complexion of the baseball player A-Rod from the New York Yankees,” who was fat and around five feet, six inches to five feet, seven inches tall, had a “wiffle [sic] short hair cut,” and was wearing a light blue tee shirt and baggy dark blue shorts."
The fifth witness saw and heard three gunshots and then saw the shooter jog toward Clarendon Street. He described the suspect as a light skinned Spanish person, of unspecified gender, who was around five feet, seven inches to five feet, eight inches tall.
So, based on these descriptions the police were looking for a man who is somewhere between four feet, nine inches and five feet, eight inches tall, either Hispanic or African-American, with relatively light skin color, who either shaves his head or wears his hair cut very short, and at the time of the murder was wearing a light blue, short-sleeved shirt and long, baggy, dark blue shorts.
The police also received some information about the vehicle that the shooter drove off in after killing Mr. Lee. The first witness saw the suspect get into and drive away in an older gray car that had a leather top, was boxy, and was in decent condition. A sixth witness was unable to describe the shooter, even though he saw him holding a gun. But the sixth witness saw a cream or beige four-door sedan, with a leather or ragtop roof, that might have been a 1989-1992 Eldorado or a Cadillac, drive away very fast just after the murder. Neither of the witnesses who saw this vehicle said anything about its license plate, including whether the vehicle was registered in Massachusetts or in some other jurisdiction.
1.2. Confidential Informant
At some point a Boston police detective received a tip about the killing of Ahmir Lee “from a person known to the Commonwealth.” According to paragraph 27 of Det. Ruiz’s affidavit, this confidential information (or “C.I.”) told Det. Jeremiah Benton that he or she had “received information that the person responsible for the shooting death of the Amhir Lee [sic] was a person known to them as ‘Michael,’ ” and “that the shooting was over drug dealing in the park.”
The affidavit did not explain the C.I.’s basis of knowledge. However, since the affidavit says that the C.I. had “received information,” it is apparent that the C.I. did not witness the shooting and instead was passing along information told to the C.I. by someone else. There is no way to tell from the affidavit whether the C.I. learned this information from someone who had witnessed the shooting and knew the people involved, or had merely overheard a rumor shared by someone who had no way of knowing that it was true.
Nor did the affidavit provide any information indicating that this informant had ever provided reliable information to the police in the past. The affidavit did not say that Det. Benton, Det. Ruiz, or any other Boston police detective or officer knew or had any previous dealings with this C.I., or that anyone in law enforcement had ever received other tips from this same C.I. The statement that the C.I. was a person known to the Commonwealth" could mean many things, including that the C.I. had some kind of unspecified criminal record in Massachusetts.
1.3. Further Police Investigation
Based on this tip, Det. Ruiz searched the Boston Police Department’s database looking for people named “Michael” who had some connection to the area where Mr. Lee had been shot dead. Ruiz said he found “several” field interrogation observations (“FIOs”) that mention Michael Jordan and describe him as being 5’4" tall, 200 lbs, and born in 1987. The affidavit does not describe Jordan’s race or skin color. Nor does it explain the content of the FIOs, or provide any information suggesting that Jordan was involved in dealing drugs in the area of Copley Square or anywhere else. Ruiz determined that Jordan lived at 133 Blue Hill Ave. in Roxbury, and that he owned a 1991 four-door Chrysler New Yorker that is described as “brown” in the Registry of Motor Vehicles database.
Ruiz then located and viewed surveillance video footage taken about four hours before the murder (7:05 p.m. on August 22, 2013) from a camera near Jordan’s home, at the intersection of Blue Hill Ave. and West Cottage Street in Roxbury. Ruiz saw that this video footage showed a man he believed to be Michael Jordan walk from the direction of 133 Blue Hill Ave. while holding what appeared to be a cell phone to his ear, and then get into a Chrysler New Yorker with a vinyl or leather half-top, and drive away. The man in the video was wearing “a long blue shirt with light colors on the back” (not a short-sleeved, light blue shirt) and dark pants (not shorts that came to his knee).
Det. Ruiz states that this individual “matched the description of the suspect,” but does not explain the basis for this opinion. He says nothing about the skin color or race of the person shown in the video, and does not describe his hair or lack thereof. But one could read paragraph 29 of the affidavit to mean that the man in the video appeared to be a light-skinned Hispanic or African-American man, seemed to be heavy or stocky, was probably at least four feet, nine inches but no more than five feet, eight inches tall, and had either a shaved head or veiy short hair, consistent with the witnesses’ descriptions of the murder suspect.
Ruiz states that he found other surveillance footage showing Jordan’s New Yorker to be parked in front of his home on Blue Hill Ave. “on a daily basis” from August 12 through August 22, 2013, but that “after the date of the murder August 22, 2013 this vehicle has not been seen parked at this location.” The RMV *183 revoked the registration for Jordan’s New Yorker on October 3, 2013. Ruiz states that on “several” occasions he has looked for this vehicle but not been able to find it. Ruiz says he suspects that Jordan is trying to hide this vehicle because it had been observed at the scene of Lee’s murder.
Det. Ruiz explains how he was able to identify the telephone number assigned to Jordan’s cell phone. He first located the number in a Boston Police database. Ruiz then determined that Jordan was a registered student at Bunker Hill Community College and had provided this phone number to BHCC as his contact number. Thereafter, the Suffolk County District Attorney’s office sent an administrative subpoena to MetroPCS and obtained records confirming that this phone number was assigned to Jordan and that Jordan’s phone was in use around the time of Lee’s murder on August 22, 2013.
There is no information in the affidavit suggesting that Mr. Jordan knew the murder victim. Nor does it present any evidence that Jordan had ever been involved in buying or selling illegal drugs, associated with a gang, or involved with any kind of violent crime prior to August 22, 2013.
2. Reasonable Expectation of Privacy
Before the Court considers the merits of Jordan’s motion to suppress, it must determine whether and to what extent Jordan is entitled to challenge the gathering of information regarding his cell phone number from MetroPCS. The seizure of materials or information is a search in a constitutional sense only if it “has intruded on a constitutionally protected reasonable expectation of privacy.” Commonwealth v. Montanez, 410 Mass. 290, 301 (1991). A defendant lacks standing to challenge a police search for evidence if he had no reasonable expectation of privacy in the place searched or evidence seized by the police. Commonwealth v. Figueroa, 468 Mass. 204, 216 (2014). “We determine whether the defendant has a reasonable expectation of privacy by considering ‘(1) whether the defendant has manifested a subjective expectation of privacy in the object of the search, and (2) whether society is willing to recognize the expectation as reasonable.’ ” Commonwealth v. Williams, 453 Mass. 203, 208 (2009), quoting Montanez, supra.
2.1. Subscriber Information and Call Records
Jordan is not entitled to challenge collection by the police of information maintained by MetroPCS to identify a cell phone subscriber. See Commonwealth v. Vinnie, 428 Mass. 161, 178 (1998) (no privacy interest in billing records and other subscriber information); Commonwealth v. Feodorqff, 43 Mass.App.Ct. 725, 729-30 (1997) (same). Nor may he seek to suppress records showing when calls were made to or from Jordan’s cell phone number or the other phone numbers associated with those calls. Smith v. Maryland, 442 U.S. 735, 742-44 (1979) (no privacy interest in telephone numbers called).
Jordan does not have a constitutionally-protected privacy interest in any of that information because he voluntarily disclosed or conveyed it to his cell phone service provider as a necessary part of obtaining cell phone service and of making or receiving telephone calls on his phone, knew or should have known that the service provider “records this information for legitimate business purposes,” and had no reasonable expectation that the company would keep that information secret. See Commonwealth v. Augustine, 467 Mass. 230, 249 (2014) {“Augustine F).
2.2. “Telephone Call” and “Registration” Cell Site Location Information
The Supreme Judicial Court has held that CSLI recorded by a service provider when the user is making or receiving a call or message is different, and entitled to constitutional protection, even though the records of which cell sites were used to route particular phone calls are also third-party business records compiled and maintained by the service provider. Jordan is therefore entitled to challenge the request to MetroPCS for six weeks of CSLI for his cell phone.
A request by law enforcement officials for two weeks or more of CSLI recording during past phone calls implicates the subscriber’s reasonable expectation of privacy and constitutes a search in a constitutional sense under art. 14 of the Massachusetts Declaration of Rights. Augustine I, 467 Mass, at 254-55. The police must therefore obtain a search warrant based on probable cause in order to obtain more than two weeks of such CSLI from a cellular service provider. Id. at 255-57. In contrast, no warrant is needed to gather such CSLI “for a period of six hours or less relating to an identified person’s cellular telephone from the cellular service provider... because such a request does not violate the person’s constitutionally protected expectation of privacy.” Commonwealth v. Estabrook, 472 Mass. 852, 858 (2015). But where the police seek more than two weeks of CSLI, the Commonwealth cannot avoid the constitutional requirement of probable cause by using less than six hours of the CSLI that it obtained from the service provider. Id. at 858-59.
To date, the Supreme Judicial Court has only addressed the constitutional implications of police requests for historic “telephone call” CSLI, which provides the approximate physical location of a cell phone when it was being used to make or receive a call. See Augustine I, supra, at 231 & n.l, 237-39 & nn.18, 24; see also id. at 259 (Gants, J., dissenting) (referring to this historical CSLI generated by cell phone use as “telephone call” CSLI).
The Court concludes that the constitutional protections afforded under art. 14 to telephone call CSLI apply with full force to so-called registration CSLI, *184 which is generated and recorded every few seconds or minutes whenever a cell phone is turned on, even when the phone is not being used to perform any function. Compare Augustine I, supra, at 238 n.18 (“[W]hen they are ‘powered on,’ cellular telephones regularly identify themselves to the nearest cell site with the strongest signal, through a process known as ‘registration.’ Registration is automatic, occurring every seven seconds.”), with In re Application for Tel. Info. Needed for a Criminal Investigation, No. 15XR90304HRL1LHK, 2015 WL 4594558, at *2 (U.S.D.C. N.D.Cal. 2015) (Koh, J.) (“A cell phone that is switched on will ping the nearest tower every seven to nine minutes”) (citing U.S. Dept. of Homeland Sec., Lesson Plan: How Cell Phones Work, p. 9 (2010), available at https://www.eff.org/files/fU.enode/3259 how cellphones work Ip.pdf, (last viewed 26 December 2015)).
There is no reason why police requests for historic telephone call CSLI would implicate privacy interests protected by art. 14, as the SJC held in Augustine I, but registration CSLI would not. “[U]nder art. 14, a person may reasonably expect not to be subjected to extended GPS [global positioning system] electronic surveillance by the government, targeted at his movements, without judicial oversight and a showing of probable cause.” Commonwealth v. Rousseau, 465 Mass. 372, 382 (2013). When the SJC held that art. 14 protects telephone call CSLI, it observed that such CSLI “implicates the same nature of privacy concerns as a GPS tracking device.” Augustine I, supra, at 248. As the SJC explained:
Location information gleaned from a [cellular telephone] provider can reveal not just where people go—which doctors, religious services, and stores they visit—but also the people and groups they choose to affiliate with and when they actually do so. That information cuts across a broad range of personal ties with family, friends, political groups, health care providers, and others ... In other words, details about the location of a [cellular telephone] can provide an intimate picture of one’s daily life. (Citations omitted.)
Id., quoting State v. Earls, 214 N.J. 564, 586 (2013). Registration CSLI paints an even more detailed picture of a cell phone user’s activities than telephone call CSLI. “Registration CSLI, for all practical purposes, is continuous, and therefore is comparable to monitoring the past whereabouts of the telephone user through a global positioning system (GPS) tracking device on the telephone!.]” Augustine I, 467 Mass, at 259 (Gants, J., dissenting); accord Commonwealth v. Estabrook, 472 Mass. 852, 858 n.12 (2015). Thus, registration CSLI implicates constitutionally protected privacy interests even more strongly than telephone call CSLI.
Augustine I distinguished prior decisions holding that one does not have a reasonable expectation of privacy in data that one voluntarily reveals to phone companies in order to obtain services. The SJC concluded that CSLI “is substantively different,” both because the privacy interest at stake in being able to track someone’s movements are so much stronger than merely known what phone number they dialed (for example), and because CSLI is merely a by-product of using cellular telephone service rather than information that the subscriber deliberately and consciously reveals to the service provider. See Augustine I, 467 Mass. at 249-51. Because of these differences, the SJC concluded that “it would be inappropriate to apply the third-party doctrine to CSLI.” Id. at 251.
The same considerations apply with full force to registration CSLI. “Cell phone use is not only ubiquitous in our society today but, at least for an increasing portion of our society, it has become essential to full cultural and economic participation . .. People cannot be deemed to have volunteered to forfeit expectations of privacy by simply seeking active participation in society through use of their cell phones.” United States v. Graham, 796 F.3d 332, 355-56, reh’g en banc granted, No. 12-4659 L, 2015 WL 6531272 (4th Cir. 2015) (cell phone users retain reasonable expectation of privacy in CSLI recorded and stored by service providers).
2.3. Text Messages and Contacts Stored by the Provider
Jordan is also entitled to challenge the request for copies of his contact list and of his incoming and outgoing text messages during the same six-week period.
The owner of a cellular telephone has a constitutionally protected, reasonable expectation of privacy in text messages sent or received, call logs, address books or other forms of contact information, and other communications and data accessed through a cell phone, whether those items and information are stored locally on the phone itself or stored in the Cloud. See Riley v. California, 134 S.Ct. 2473, 2489-93 (2014). As a result, the police generally may not use someone’s cell phone to access those communications and information without first obtaining a search warrant. Id. at 2493-95.
It should not make any constitutional difference whether police seek to access text messages and contact information through an individual’s cell phone, as in Riley, or to obtain the exact same information from storage devices maintained by or for the cellular service provider, as in this case. “Cloud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself. Cell phone users often may not know whether particular information is stored on the device or in the cloud, and it generally makes little difference . . . Moreover, the same type of data may be stored locally on the device for one user and in the cloud for another.” Riley, supra, at 2491.
*185 A cell phone user’s strong privacy interest in his or her text messages and other private communications and information does not evaporate merely because, with the advent of cloud computing, those things are now likely to be stored on devices maintained by or for one’s wireless service provider. As the Supreme Judicial Court has cautioned, “the rapid expansion in the quantity of third-party data generated through new technologies raises important questions about the continued viability of the third-party doctrine in the digital age.” Augustine I, 467 Mass, at 252 n.35. “[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties . . . This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.” Id.., quoting United States v. Jones, 132 S.Ct. 945, 957 (2012) (Sotomayor, J., concurring). The automatic cloud storage of text messages that are never read or seen by any human being is fundamentally different than telephone answering services a generation ago that used human operators to speak with callers and write down messages on paper slips. Cf. Commonwealth v. Cote, 407 Mass. 827, 835 (1990) (no reasonable expectation of privacy in telephone messages recorded on paper slips by answering service).
In sum, the Court concludes that “users of text messaging services . . . have a reasonable expectation of privacy in their text messages stored on the service provider’s network,” and that such messages are therefore protected against unreasonable government searches by art. 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution. See Quon v. Arch Wireless Operating Co., 529 F.3d 892, 904 (9th Cir. 2008) (applying Fourth Amendment), rev’d and remanded on other grounds sub nom. City of Ontario, Cal. v. Quon, 560 U.S. 746, 757-65 (2010) (assuming Quon had reasonable expectation of privacy in text messages, but holding that government employer’s review of those messages was reasonable); accord State v. Branigh, 313 P.3d 732, 738-39 (Idaho Ct.App. 2013), cert. denied, 134 S.Ct. 1342 (2014) (applying Idaho constitution); State v. Clampitt, 364 S.W.3d 605, 610-11 (Mo.Ct.App. 2012) (applying Fourth Amendment). The same is true of email messages, contact lists, and other personal communications and information that one accesses on a cell phone but that may be stored in the cloud. See United States v. Warshak, 631 F.3d 266, 288 (6th Cir. 2010) (under Fourth Amendment, subscriber has reasonable expectation of privacy in content of emails stored by or sent and received through Internet service provider).
3. Lack of Probable Cause to Obtain CSLI and Texts
Under the Massachusetts Constitution, the police cannot obtain more than two weeks of historic telephone call CSLI for a particular phone number unless they submit an affidavit “demonstrate[ing] probable cause to believe ‘that a particularly described offense has been, is being, or is about to be committed, and that the [CSLI being sought] will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense.’ ” Commonwealth v. Augustine, 472 Mass. 448, 453 (2015) (“Augustine II’), quoting Augustine I, 467 Mass, at 256, and Commonwealth v. Connolly, 454 Mass. 808, 825, 913 N.E.2d 356 (2009). For the reasons discussed above, the Court concludes that the same constitutional requirement governs the request to MetroPCS in this case for Jordan’s registration CSLI, text messages, and contact information over a six-week period.
The Court must suppress the CSLI, text messages, and contact information obtained from MetroPCS because the affidavit submitted by Det. Ruiz did not establish probable cause to believe that Mr. Jordan killed Mr. Lee, or that the requested information would provide evidence of this crime for any other reason.
Although Ruiz represented that Jordan’s general appearance and the clothing he was wearing four hours before the murder were consistent with the descriptions of the killer provided by the six eyewitnesses, that was not enough to provide probable cause to believe that Jordan may have been the person who shot Ahmir Lee. “A description equally applicable to a large number of people, without more, may not support a finding of probable cause.” Commonwealth v. Carrington, 20 Mass.App.Ct. 525, 528 (1985) (where “rapist had been described as a black male in his thirties with a receding hairline, a moustache and a beard, and wearing a blue running jacket and dark shorts,” fact that defendant met this description was insufficient to provide probable cause to believe he was rapist); accord Commonwealth v. Avalo, 37 Mass.App.Ct. 904, 906 (1994) (police lacked probable cause to arrest defendant based on informant’s tip, even though police corroborated that defendant matched physical description provided by informant “in terms of national origin or ethnic group; hair color, build, and approximate height”). Nor did the combination of Jordan’s appearance and the fact that police records showed that Jordan had been seen in the Copley Square area at some unspecified times unrelated to Lee’s murder did not provide probable cause to believe he had killed Lee. See Commonwealth v. Scott, 440 Mass. 642 (2004) (police lacked reasonable suspicion to stop defendant merely because he matched “general description of’ suspect as “a tall, muscular, black male,” and police saw him in general *186 area where sexual assaults had taken place several months earlier). The affidavit presented no evidence that Jordan knew Lee or had any other connection to him.
Adding in the facts that Jordan was the registered owner of a brown 1999 Chrysler New Yorker with a partial vinyl or leather top, that Jordan was seen on video getting into his vehicle four hours before the murder, and that the police had not been able to locate the vehicle after the murder—together with Jordan’s general appearance—still did not provide probable cause to believe that Jordan had been involved in Lee’s murder. Even assuming that the appearance of Jordan’s brown Chiysler New Yorker was consistent with the witnesses’ description of a grey, cream, or beige vehicle, the affidavit failed to establish that a boxy sedan of that general color with a vinyl or leather roof is particularly distinctive in the Boston or New England area. There is no way to tell from the affidavit whether scores, hundreds, or many thousands of vehicles still on the road within a reasonable drive of the murder scene would match the general description provided by the witnesses. Thus, the combination of Jordan’s physical appearance and the fact that he owned New Yorker with a vinyl top did not provide probable cause to believe that Jordan killed Lee. Cf. Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) (where witness described suspect as black male wearing three-quarter length black goose down jacket, but Commonwealth presented no evidence that such a jacket was unusual or distinctive, police lacked reasonable suspicion to stop defendant merely because he was African-American, wearing such a jacket, and walking half mile from scene of stabbing). In the absence of evidence that Jordan’s car is particularly distinctive, the added fact that the police could not locate that vehicle after August 22, 2014, may be suspicious, but it does not rise to the level of probable cause to believe that Jordan was involved in Lee’s murder.
Det. Ruiz tried to tie all of this evidence about Jordan and his vehicle to Lee’s murder through the confidential informant’s tip that “Michael” had killed Lee because of a dispute over “drug dealing in the park.” In order for this information from the C.I. to be given any weight, the affidavit must “demonstrate (1) some underlying circumstances from which the law enforcement officials could have concluded that the information was reliable (the veracity test); and (2) some underlying circumstances which demonstrate a basis of the informant’s knowledge (basis of knowledge test).” Commonwealth v. Robinson, 403 Mass. 163, 164-65 (1988). Each prong of this test “presents a separate important consideration.” Commonwealth v. Bottari, 395 Mass. 777, 783 (1985). “Independent police corroboration may make up for deficiencies in one or both of these factors.” Commonwealth v. Lyons, 409 Mass. 16, 19 (1990). “These are vital, not merely perfunctoiyU requirements. To justify the intrusion of [a] search, the tip must not only come from a credible person, but he must be shown to be relying on something more than a casual rumor or an individual’s general reputation.” Robinson, supra, at 165, quoting Commonwealth v. Avery, 365 Mass. 59, 63 (1974).
By law, the Court may not give this part of the affidavit any weight because Det. Ruiz did not explain the informant’s basis of knowledge, provide any evidence that the informant was reliable, or show that the Boston police had been able to corroborate the limited information provided by the informant. With respect to basis of knowledge, the affidavit says only that the informant reported that he or she had “received information” from someone else. That is not enough. With respect to veracity, the affidavit says only that the informant was “known to the Commonwealth.” It does not say that the informant had ever provided tips before, and thus there is no way to tell whether the informant is usually truthful. Finally, with respect to corroboration, there was none. The only information provided by the informant is that the shooter’s name was Michael and the shooting had something to do with drug dealing. Nothing in the affidavit suggests that the police were able to corroborate either of these assertions. The fact that the Boston police came to suspect someone named Michael whose appearance and vehicle are said to be consistent with the eyewitnesses’ statements does not corroborate anything that the informant passed along, since the informant did not say anything about the shooter’s appearance or what kind of vehicle he was driving.
In sum, the affidavit of Det. Ruiz did not establish that there was probable cause to believe that any of the information sought from Mr. Jordan’s cell phone provider would provide evidence of this murder. Nor did it establish that the police had probable cause to believe that Jordan had committed the murder, and that the requested information would help the police locate and apprehend Jordan. The Court must therefore suppress the CSLI, text messages, and contact information obtained from MetroPCS.
ORDER
Defendant’s motion to suppress evidence is ALLOWED IN PART and DENIED IN PART. The Court orders that all cell site location information (including but not limited to information regarding cell site tower locations, cell sites, and global positioning system records), all incoming or outgoing text messages, and all contact information obtained from MetroPCS pursuant to the challenged search warrant are hereby suppressed and may not be used as evidence against Defendant at trial. The motion is denied with respect to subscriber information and any call details regarding dates, times, and telephone numbers of calls made to or from the cellular phone number specified in the search warrant.